UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| **TERRELL MCELRATH,** | ] |
| **Plaintiff,** | ] |
| v. | ] Case No.: 1:20-cv-01235-ACA |
| **FCA US LLC,** | ] |
| **Defendant.** | ] |

## **MEMORANDUM OPINION**

This case comes before the court on Defendant FCA US LLC's amended motion for summary judgment. (Doc. 30). Plaintiff Terrell McElrath asserts one claim under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD") and state law claims for negligence, breach of implied warranty of merchantability, and wantonness against FCA arising out of a car crash. (Doc. 1). Mr. McElrath alleges that FCA caused the crash and his resulting injuries by manufacturing a vehicle with a dangerously defective cruise control system. (*Id.* at 1–2 ¶¶ 1–4).

FCA moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, asserting that no genuine dispute of material fact exists and that it is entitled to judgment as a matter of law. (Doc. 30). Because Mr. McElrath cannot show that the alleged defect caused his injures, the court **WILL GRANT** the amended motion for summary judgment.

**I.     BACKGROUND**

On a motion for summary judgment, the court "draw[s] all inferences and review[s] all evidence in the light most favorable to the non-moving party." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012) (quotation marks omitted).

FCA manufactured the vehicle at issue in this case, a 2014 Ram 1500 pickup truck. (Doc. 36-2 at 2). On September 23, 2018, Mr. McElrath was driving the truck east on Goodwater Highway in Talladega County, Alabama. (Doc. 36-1 at 7). The truck was towing an ATV on a trailer. (*Id.*). Mr. McElrath testified that at some point he engaged the cruise control set at 55 mph. (Doc. 29-3 at 21). A few minutes later, he attempted to disengage cruise control by tapping on the brake pedal. (Doc. 36-1 at 7). When he tapped on the brake pedal, the truck "suddenly and uncontrollably" accelerated to about 70 mph. (*Id.*). He kept tapping on the brakes to make the truck stop but the truck kept accelerating. (Doc. 29-3 at 23). As a result, he lost control of the truck, the trailer hit the back of the truck, and the truck careened off the highway and hit a tree. (Doc. 36-1 at 7–8). The impact knocked him unconscious, and he had to be airlifted to a hospital. (*Id.* at 8).

At the time of the crash, the truck was subject to an open safety recall, Safety Recall U61, related to the cruise control system. (Doc. 29-4; doc. 29-5 at 7; *see* doc. 34 at 6). The recall notice provides:

> The fault handling strategy of the Powertrain Control Module (PCM) software on your vehicle does not remove positive torque requests from the engine controller if the CAN-C bus stops communicating while the cruise control is requesting positive torque. In the instance of a short in the vehicle causing the CAN-C bus to stop communicating while the cruise control is active and the vehicle speed is below the set speed such that the cruise control system is requesting positive torque at the exact moment of the short, it is possible for a positive torque request to be locked on the PCM which may result in either the vehicle maintaining its current speed or possibly accelerating. **If the driver does not shift to neutral or apply the brakes to stop the vehicle this condition can cause a vehicle crash without warning.**

(Doc. 29-4 at 2) (emphasis in original). The PCM is the computer that controls the speed of the engine and the CAN bus[1] is a network that allows computer modules in the truck to exchange information. (Doc. 29-5 at 5). So, if cruise control is engaged and the truck is traveling slower than the set cruise control speed, then the cruise control system uses the CAN bus to tell the PCM to make the truck accelerate. (*See* doc. 29-2 at 19–20; doc. 29-5 at 5, 7). But, according to the recall notice, if the CAN bus fails because of a short while the truck is accelerating to the cruise control speed, then the cruise control system would have no way to tell the PCM that the truck has reached the cruise control speed, and the PCM therefore might be locked in the accelerating state. (*See* doc. 29-2 at 19–20; doc. 29-4 at 2; doc. 29-5 at 5, 7).

The truck contained an occupant restraint control ("ORC") computer that recorded pre-crash data in a crash data retrieval ("CDR") file. (Doc. 29-2 at 11; doc.

---

[1] The parties use the terms "CAN-C bus" and "CAN bus" interchangeably. Therefore, the court will as well using whatever convention is contained in the cited testimony.

29-5 at 7). The ORC receives information from different modules in the truck through the CAN bus. (Doc. 29-2 at 12; doc. 29-5 at 8). The ORC measures information like vehicle speed, odometer, cruise control status, accelerator pedal percentage, brake pedal percentage, and more. (*See* doc. 29-2 at 14; doc. 29-5 at 8).

The CDR file from Mr. McElrath's truck contained data for 5.4 seconds before the crash. (Doc. 29-2 at 12; doc. 29-5 at 8). Experts for both parties stated, and Mr. McElrath admitted, that the CDR file indicated that the truck was traveling at approximately 70 mph for approximately five seconds before impact, the brake pedal was applied approximately three seconds before impact, and the cruise control system was off and never engaged during the entire 5.4 seconds before impact. (Doc. 29-2 at 12; doc. 29-5 at 8; doc. 37 at 4–8).

R. Patrick Donahue, who Mr. McElrath retained as an expert to inspect the truck and opine as to the cause of the crash, concluded in his expert report that "[t]he testimony of the driver"—*i.e.*, that the cruise control failed to disengage when Mr. McElrath pressed the brake pedal and the truck kept accelerating—"is consistent with the defective failure mode described in the recall documents." (Doc. 29-5 at 9). Mr. Donahue supported his opinion with a particular diagnostic trouble code ("DTC"), U0001-00, triggered by the radio frequency hub and the instrument panel cluster in the truck. (*Id.* at 10). According to Mr. Donahue, the DTC indicated that the CAN bus failed at some undetermined time before the crash, which would be

4

consistent with the recall condition. (*Id.* at 9–10). Mr. Donahue did not know exactly when the DTC occurred because of an inexplicable discrepancy between the odometer data from the DTC and the CDR file. (*Id.*). However, based on that odometer data, he testified that the DTC happened within the four miles before impact or was caused by the crash itself. (Doc. 29-5 at 9–10; doc. 29-7 at 37). The DTC was "stored" as opposed to "active," meaning that the condition that caused the DTC was no longer present when he scanned the truck. (Doc. 29-5 at 9–10; doc. 29-7 at 39). Mr. Donahue also testified that he did not have sufficient information to conclude that the CAN bus failure identified in Safety Recall U61 caused Mr. McElrath's truck to accelerate and crash. (Doc. 29-7 at 30).

Lisa Fodale was deposed as FCA's Rule 30(b)(6) corporate designee. (Doc. 29-6). She testified extensively about the CAN bus, DTCs, and the recall condition. (*See, e.g.*, *id.* at 25–41). Mr. McElrath relies particularly on her following testimony in asserting that his truck experienced the recall condition (*see* doc. 37 at 7–10, 15–17, 19):

- "[I]f you have a short to ground, then[] the modules that communicate through CAN bus C would not be able to communicate." (Doc. 29-6 at 29).
- The failure of the CAN bus causes the U0001 DTC.[2] (*Id.* at 16, 19, 24).

---

[2] The parties refer to DTC U0001-00 and DTC U0001 interchangeably. Therefore, the court will as well using whatever convention the cited testimony does.

5

- Prior to fixing the recall condition, "when the diagnostic trouble code U0001 was set and the CAN-C bus was down, there would be no further communication if the cruise control is engaged; it would just continue to be engaged," and, in other words, "if the U0001 DTC was set . . . there was nothing that told the cruise control or nothing that controlled cancelling cruise control." (*Id.* at 19).

- She described the recall condition consistent with the recall notice and as set out above. (*See id.* at 32–33). In particular, she testified that the truck could continue accelerating past the cruise control speed if the recall condition occurred. (*Id.* at 32).

- The recall fix was only a software change, after which cruise control would be cancelled in the event of a U0001 DTC while cruise control was engaged. (*See id.* at 20, 36–37).

- FCA tested the recall condition in October 2017 by forcing the CAN bus to fail in a test vehicle, the U0001 DTC appeared as expected, and though there was supposed to be "a reaction to that diagnostic trouble code that [was] suppose[d] to shut off cruise control at that time," that reaction "had not been properly implemented in the software." (*Id.* at 19).

In addition, the record contains documentation of Society of Automotive Engineers Standard J195, a recommended "series of engineering guidelines for the

design of an automatic vehicle speed control" issued in 1970. (Doc. 36-6). Standard J195 recommends that a cruise control system "shall be deactivated upon application of the service brakes," and "shall be capable of deactivation" in the event of "[f]ailure of any power source to the device," "short circuit of electrical leads of the device," or "[f]ailure of other vehicle components upon which the device is dependent for function." (*Id.* at 1–2). According to Mr. Donahue, "[t]he defective failure mode as outlined in the recall documents is a violation of this provision of the Standard." (Doc. 29-5 at 7).

## II.   DISCUSSION

In deciding a motion for summary judgment, the court must determine whether, accepting the evidence in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Hamilton*, 680 F.3d at 1318. "[T]here is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Looney v. Moore*, 886 F.3d 1058, 1062 (11th Cir. 2018) (quotation marks omitted).

Mr. McElrath brings four claims against FCA under Alabama law: (1) violation of the AEMLD; (2) negligence; (3) breach of implied warranty of merchantability; and (4) wantonness. (Doc. 1 at 8–12). All of Mr. McElrath's claims in this case are based on his allegation that the defect identified in Safety Recall U61

caused his accident. Specifically, he argues that his truck was defective because the CAN-C bus experienced a short circuit while cruise control was engaged, and when he tried to disengage the cruise control, the truck accelerated suddenly. (Doc. 1 at ¶¶ 26–28, 36). FCA moves for summary judgment on all of Mr. McElrath's claims, asserting that Mr. McElrath failed to produce sufficient evidence that the alleged defect in his truck caused the crash. (Doc. 34 at 3–4; *id.* at 18).

  1. AEMLD Claim

"The AEMLD is a judicially created accommodation of Alabama law to the doctrine of strict liability for damage or injuries caused by allegedly defective products." *Keck v. Dryvit Sys., Inc.*, 830 So. 2d 1, 5 (Ala. 2002). To succeed on an AEMLD claim, a plaintiff must "affirmatively show a defect in the product" and "that the defect caused the injury." *Verchot v. Gen. Motors Corp.*, 812 So. 2d 296, 301 (Ala. 2001) (quotation marks omitted); *see Sears, Roebuck & Co., Inc. v. Haven Hills Farm, Inc.*, 395 So. 2d 991, 995 (Ala. 1981) ("The burden of proof rests with the injured consumer to prove that the product left the defendant's control in an unreasonably dangerous condition not fit for its expected use, and that which rendered the product in such an unfit condition in fact caused the injury.")

FCA argues that Mr. McElrath's AEMLD claim fails because he has not produced expert testimony showing the existence of a defect or that the defect caused his injuries. (Doc. 34 at 7–18). Although a plaintiff need not always produce expert

testimony to establish an AEMLD claim, "because of the complex and technical nature of the product and in order to present evidence from which a lay jury may reasonably infer that a defective condition of the product was the cause of the product's failure and the cause of the resultant injury to the plaintiff, expert testimony is *usually* essential and, therefore, usually required." *Brooks v. Colonial Chevrolet-Buick, Inc.*, 579 So. 2d 1328, 1332 (Ala. 1991) (emphasis in original). The precise systems involved here are the PCM software and the CAN bus which communicate with one another to operate the cruise control function in a truck. (Doc. 1 at ¶¶ 27–28; *see also* doc. 29-5 at 5). Whether, as alleged, the CAN bus stopped working because of a short in the truck and did not properly send messages to the truck's PCM to correctly operate the cruise control is "complex and technical." *Brooks*, 579 So. 2d at 1332. Therefore, for Mr. McElrath to show that this purported defect caused his injuries, he must support his claim with expert testimony.

The court has strong reservations about whether Mr. McElrath has presented evidence showing that the presence of the alleged defect in his truck. But even if he had, his AEMLD claim cannot survive summary judgment because his expert, Mr. Donahue, did not opine that the alleged defect caused his accident.

Generally, a plaintiff need not "establish the specific defect that caused his injury." *Goree v. Winnebago Industries, Inc.*, 958 F.2d 1537, 1541 (11th Cir. 1992) (citing *Sears, Roebuck & Co., Inc.*, 395 So. 2d at 995). But here, Mr. McElrath's

9

complaint narrows the scope of any potential defect that could have caused his accident. The complaint identifies one and only one alleged defect: the defect identified in Safety Recall U61 which on its face requires both (1) a short in the truck causing the CAN bus to stop communicating; and (2) that cruise control is engaged. (Doc. 29-4 at 2). Mr. McElrath's expert's testimony does not establish that either of these conditions existed at the time of the crash, and therefore, the alleged defect could not have caused Mr. McElrath's injuries.

Mr. Donahue has "no specific evidence" to show that that the CAN bus shorted in the 5.4 seconds prior to the crash, and he agrees that data in the CDR file indicates that the CAN bus was functioning just before the accident. (Doc. 29-7 at 30; *see id.* at 29–30). He also testified that he would "need more information" to offer an opinion that "there was, in fact, a short in the CAN bus C that resulted in the recall condition and caused the acceleration of" Mr. McElrath's truck. (*Id* at 30.; *see also id.* at 31 (stating that it was not his opinion that a short in the CAN bus consistent with the recall condition "caused the vehicle to accelerate and be in an accident"). Mr. Donahue also agrees that the black box data from the truck demonstrates that cruise control was not engaged at the time of the accident and that Mr. McElrath was depressing the accelerator pedal before applying the brakes in the seconds before the crash. (Doc. 29-7 at 33; *see also* doc. 29-5 at 8).

Because Mr. McElrath has not offered expert testimony demonstrating that the alleged defect caused his truck to crash, Mr. McElrath's AEMLD claim fails as a matter of law and FCA is entitled to summary judgment.

### 2. Remaining State Law Claims

Mr. McElrath's claims for negligence, breach of implied warranty of merchantability, and wantonness all require him to show that FCA's conduct caused his injuries. *See Rutley v. Country Skillet Poultry Co.*, 549 So. 2d 82, 85 (Ala. 1989) ("The necessary elements for recovery under a negligence theory are duty, breach of that duty, proximate cause, and injury."); *Sparks v. Total Body Essential Nutrition, Inc.*, 27 So. 3d 489, 492 (Ala. 2009) ("In an action based on breach of warranty, it is of course necessary to show not only the existence of the warranty but the fact that the warranty was broken and that the breach of the warranty was *the proximate cause* of the loss sustained.") (quoting § 7–2–314, Ala. Code 1975, Official Comment, ¶ 13) (emphasis in original); *Brown v. Turner*, 497 So. 2d 1119, 1120 (Ala. 1986) ("In order for the trial court to find a party guilty of wanton conduct, it must be shown that with reckless indifference to the consequences the party consciously and intentionally did some wrongful act or omitted some known duty, and that this act or omission produced the injury.").

As discussed above, *see supra* pp. 9–11, Mr. McElrath has not shown that the alleged defect caused the accident. The same analysis applies with respect to his

remaining state law claims. Because he cannot show causation, his claims for negligence, wantonness, and implied warranty of merchantability fail as a matter of law, and FCA is entitled to summary judgment on these claims.

## III. CONCLUSION

For the reasons explained above, Mr. McElrath has not produced sufficient evidence to raise a genuine dispute of fact as to whether a defective and unreasonably dangerous condition in his truck caused the crash and his resulting injuries. Accordingly, the court **WILL GRANT** FCA's amended motion for summary judgment and **WILL ENTER SUMMARY JUDGMENT** in favor of FCA and against Mr. McElrath on all of his claims.

The court will enter a separate order consistent with this memorandum opinion.

**DONE** and **ORDERED** this October 25, 2022.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE